**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0469n.06

**No. 09-1610**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*May 02, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| J.O.A. CONSTRUCTION COMPANY, INC.; JOHNSON O. AKINWUSI, | ) ) | |
| Defendants-Appellants. | ) ) | |

Before: COOK, McKEAGUE, and ROTH,[*] Circuit Judges.

COOK, Circuit Judge. This appeal concerns a surety's right to indemnification from a construction company under the terms of an indemnification agreement, and a purported conflict of interest that arose from defense counsel's unauthorized joint representation of the insurance company in a collateral arbitration proceeding during the pendency of this dispute. Defendants-Appellants J.O.A. Construction Company, Inc. ("JOA") and Johnson Akinwusi, JOA's owner, appeal the district court's grant of summary judgment to Plaintiff-Appellee Travelers Casualty & Surety Company of America ("Travelers"). Appellants also challenge the district court's denial of their Rule 60 motion—filed during this appeal under the "*Hirsch* remand" procedure set forth in *First National*

---

[*]The Honorable Jane R. Roth, Senior Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

*Bank v. Hirsch*, 535 F.2d 343 (6th Cir. 1976)—which argued that defense counsel's conflict precluded them from filing opposition to Travelers' motion for summary judgment. Finding no error, we affirm both judgments.

I.

*A. The Indemnification Agreement*

JOA has worked on commercial and government construction projects since 1989. For more than ten years, Travelers acted as JOA's surety, issuing performance and payment bonds for JOA's construction projects pursuant to indemnification agreements with JOA and Akinwusi. Under the agreements, Travelers' bonds assure the project owner that JOA will perform the construction project (performance bonds), or assure suppliers and subcontractors that JOA will pay its contractual debts to them (payment bonds); in return, JOA and Akinwusi promise to indemnify Travelers for claims made on the bonds.

The relevant indemnification agreement in this case (the "Agreement") provided that "[JOA and Akinwusi] shall exonerate, indemnify and save [Travelers] harmless from and against all Loss," defining "loss" to include the following:

> All loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of [Travelers']: (a) making any investigation in connection with the Bond; (b) prosecuting or defending any action in connection with any Bond; (c) obtaining the

> release of any Bond; (d) recovering or attempting to recover Property in connection
> with any Bond or this Agreement; (e) enforcing by litigation or otherwise any of the
> provisions of this Agreement. . . .

(Compl. Ex. A (General Agreement of Indemnification) ¶¶ 1, 3.)  With regard to the adjustment of claims under the bonds, the Agreement vested Travelers with the "right, in its sole discretion, to determine for itself and [JOA] whether any claim, demand or suit brought against [Travelers or JOA in relation to a bond] shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon [JOA]." (*Id.* ¶ 4.)  For Travelers to claim indemnification from JOA and Akinwusi under the Agreement, it had to present "[a]n itemized, sworn statement by an employee of [Travelers], or other evidence of payment," which would serve as "prima facie evidence of the propriety, amount and existence of [JOA's and Akinwusi's] liability." (*Id.* ¶ 3.)  The Agreement also authorized Travelers to demand collateral from JOA and Akinwusi in an amount "sufficient to discharge any Loss or anticipated Loss." (*Id.* ¶ 5.)

*B. The Underlying Litigation & Travelers' Unopposed Motion for Summary Judgment*

According to Travelers, bondholders began filing claims against JOA in 2007 for non-performance and non-payment, and Travelers began investigating and paying those claims. Travelers invoked its right to collateral in May 2007 and then filed suit in August 2007 after JOA and Akinwusi failed to pay.  Appellants, represented by John Grylls, answered Travelers' complaint in October 2007.  Travelers moved for summary judgment in July 2008, presenting a sworn statement documenting more than $6 million in net losses and requesting more than $2 million in

collateral. (R. 15 & Ex. C.) JOA and Akinwusi did not respond to the motion, and the district court granted summary judgment to Travelers in March 2009, awarding $6,024,714.64 in damages, directing JOA and Akinwusi to turn over their financial records to Travelers and post collateral totaling $2,352,978.18, and granting leave for Travelers to seek additional losses incurred between the date of its motion and the date of judgment. *Travelers Cas. & Sur. Co. of Am. v. J.O.A. Const. Co.* ("*Travelers I*"), No. 07-13189, 2009 WL 928848, at *3–4 (E.D. Mich. Mar. 31, 2009).

## C. Appellants' Rule 60 / Hirsch *Motion Asserting Attorney Conflict*

JOA and Akinwusi timely appealed in April 2009 and then filed a Rule 60 motion in the district court seeking a *Hirsch* remand. Likening the unopposed summary judgment to a default judgment, Appellants alleged that an undisclosed conflict of interest prevented Grylls, their longtime defense counsel, from opposing Travelers' summary judgment motion. Appellants revealed that, before and during this litigation, Grylls simultaneously represented JOA and Travelers in collateral proceedings initiated by bondholder Consolidated Electric (the "Consolidated Electric" proceedings). Travelers contends that its interests aligned with JOA in that dispute because Consolidated Electric named both as defendants. The Consolidated Electric proceedings concluded at the end of October 2007—soon after Grylls filed Appellants' answer in this litigation—with a $465,288 arbitration award to Consolidated Electric. Travelers paid the arbitration award.

Grylls began his joint representation of JOA, Akinwusi, and Travelers in the Consolidated Electric proceedings in January 2007. His initial letter to Travelers indicated that JOA selected him

to represent Travelers in that case. (R. 31, Ex. 1, Ex. A (letter and answer).) After Travelers filed this suit against JOA and Akinwusi in July 2007, Grylls sent a conflict letter to all three parties alerting them to the potential conflict and requesting that all three consent to his simultaneous representation in the Consolidated Electric proceedings. (R. 24-8 ("conflict letter" of August 20, 2007).) The conflict letter concluded by noting that, in the event that Travelers sought to utilize the firm in future actions involving JOA, consent would waive the right to "seek to disqualify this law firm . . . on the basis of any representation of J.O.A. with respect to the Travelers suit against J.O.A." (*Id.*) Only Travelers expressly consented, but Grylls continued his joint representation of Travelers and Appellants in the Consolidated Electric proceedings without objection, while representing Appellants in this litigation. Travelers' records from this period reflect that the surety paid Grylls more than $20,000 for his legal services between September and December 2007. (*See* R. 24-9.)

According to Appellants, Travelers' payments to Grylls and Grylls's joint representation of Travelers in the Consolidated Electric proceedings may have prevented Grylls from opposing Travelers' motion for summary judgment. As a result, Appellants claim that they lost the opportunity to present meritorious defenses to Travelers' claimed losses, namely (1) that Travelers did not show that the losses "were properly due and owing," as required for a default under the Agreement, and (2) that Travelers acted in bad faith by commandeering their business.

In support of their argument regarding the bond claims, Appellants submit Akinwusi's affidavit and their standard subcontractor's agreement. Akinwusi generally denies JOA's liability

for bond claims paid prior to April 12, 2007, a date relevant to their bad faith claims. He also notes that JOA's subcontractor agreements conditioned payment of subcontractors upon JOA's receipt of payment under the construction project's general contract. (R. 24-11 (Akinwusi aff.) ¶¶ 2–4, 28; *see also* R. 24-4 (subcontractor agreement) ¶ 16.4(c).)

As for bad faith, Appellants assert that Travelers first reassigned a mostly completed construction project in the spring of 2007, and then issued cease-payment letters to the owners of JOA's other projects, effectively freezing JOA's assets. The record reflects that Travelers reassigned the Total Army School System Fort Cluster Training Center construction project (the "TASS project") after the Army sent a termination letter on February 23, 2007, that unequivocally cancelled JOA's contract. (R. 24-6 (termination letter).) The Army's termination letter detailed a number of defects with the project dating back to 2005, including "unacceptable masonry work, inoperable mechanical units, inoperable controls, and life safety issues." (*Id.* ¶¶ 2–3.) Although the Army deemed the project 96% complete, it believed that JOA "ha[d] made minimal effort to complete the project" for nearly a year. (*Id.* ¶ 3(c).) Travelers issued the cease-payment letters on April 12, 2007.

Appellants argue that these actions demonstrate bad faith because of the completion status of the project and the effect of the cease-payment letters on JOA's business. They aver that the cease-payment letters not only froze JOA's assets, but caused Akinwusi to suffer a stroke the next day, necessitating greater reliance on Grylls's legal representation. Further, Appellants aver that Travelers and the Army reneged on a post-termination oral agreement to allow JOA to remedy any

deficiencies with the TASS project. Specifically, Akinwusi and JOA General Manager Sammie Allen claim to have met with Army and Travelers' representatives around March 2007 to discuss the TASS project, whereupon the parties agreed to allow JOA to complete the project following the appraisal of an independent engineer. (R. 24-16 (Allen aff.) ¶¶ 3–8; Akinwusi aff. ¶¶ 7–10.)

In addition to the attorney-conflict arguments, Appellants' *Hirsch* motion argued that Akinwusi should not be held individually liable and alleged offsets for payments that Travelers failed to credit.

The district court denied Appellants' Rule 60 motion. *Travelers Cas. & Sur. Co. of Am. v. J.O.A. Constr. Co.* ("*Travelers II*"), No. 07-13189, 2010 WL 4792182, at *10 (E.D. Mich. Nov. 18, 2010). First, the district court declined to treat the motion under the deferential standard applicable to motions to vacate a default judgment, explaining that

> the Court rendered a judgment for the Plaintiff after fully examining the case on its merits and determining that the Indemnity Agreement clearly and unambiguously obliged the Defendants to (1) hold Travelers harmless from Loss, as defined by the contract, (2) provide Travelers with collateral security and (3) allow Travelers to have access to its books, records, and accounts.

*Travelers II*, 2010 WL 4792182, at *4. Applying the stricter standards of Rule 60(b)(3) and (b)(6), the court concluded that Appellants failed to present clear and convincing evidence "that Grylls acted with fraudulent intent, or that his omissions deceived the Court." *Id.* at *5. The court explained that Grylls had promptly disclosed the conflict to the parties by asking them to consent to the joint

representation in the arbitration action, and even though Grylls did not disclose the joint representation to the court, JOA failed to present evidence that Grylls withheld that information to mislead the court. *Id.* at *5–6. Although the court deemed Grylls's nondisclosure "troubling," the court concluded that "it fell far short of the recklessness" warranting post-judgment relief in other cases, and noted that "it would have still reached the same result and granted relief to Travelers based on the merit of its claims, and notwithstanding Akinwusi's signficant illness." *Id.* at *6.

The district court then examined and rejected each of Appellants' defenses. With regard to Appellants' claim that Travelers had not shown the payments "properly due and owing," the court explained that the Agreement provided other reasons for default—including a contract owner's declaration of default, as the Army did in its February 2007 termination letter—but that in any event, the Agreement vested Travelers with the ultimate discretion to settle claims without recourse to a default. *Id.* at *7 (citing Agreement ¶ 4). As for bad faith, the court found that the February 2007 termination letter from the Army constituted an unambiguous default under the Agreement and therefore authorized Travelers to reassign the TASS project and issue the April 12 letters freezing JOA's other contracts. *Id.* at *8. The court further found that Appellants had not presented clear and convincing evidence, as required by Michigan law, that the parties orally modified the Agreement or the TASS contract in a manner that relieved JOA of responsibility for the TASS project, and then rejected Appellants' challenges to Akinwusi's individual liability and Travelers' statement of losses for lack of evidence. *Id.* at *8–10.

JOA and Akinwusi appeal, challenging parts of the district court's grant of summary judgment and denial of their Rule 60 motion. They do not appeal the district court's collateral award, its finding of Akinwusi's individual liability, or its denial of their claim that Travelers failed to credit certain payments.

## II.

We generally review a district court's grant of summary judgment de novo under the well-established standards of Federal Rule of Civil Procedure 56. *See, e.g.*, *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A court may only grant summary judgment if it determines, after drawing all reasonable inferences in favor of the non-moving party, that the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Appellants contend, however, that we should treat the district court's judgment under the more lenient standard applicable to motions to vacate default judgments, arguing that Travelers failed to present sufficient evidence of its entitlement to judgment as a matter of law under the Agreement. *See Weiss v. St. Paul Fire & Marine Ins. Co.*, 283 F.3d 790, 795 (6th Cir. 2002) (noting preference for judgment on the merits, when considering whether to vacate default judgment). Specifically, Appellants assert that the district court committed legal error by overlooking Travelers' failure to show two prerequisites for indemnification under the Agreement:

(1) that paid bond claims were "properly due and owing," and (2) that it settled the bond claims in good faith.

We find these arguments meritless and reject Appellants' characterization of the district court's judgment because the Agreement does not require proof of "properly due and owing" claims for indemnification, and Appellants failed to plead an affirmative defense of bad faith. Because Travelers satisfied its burden under the Agreement and Appellants failed to demonstrate a genuine issue of material fact, the district court properly entered a judgment on the merits.

### A. Properly Due & Owing

Contrary to Appellants' suggestion, the Agreement does not require Travelers to show that it paid claims that were "properly due and owing" in order to trigger indemnification coverage. Rather, the Agreement provides that "[a]n itemized, sworn statement by an employee of [Travelers], or other evidence of payment" will suffice as "prima facie evidence of the propriety, amount and existence of [JOA's and Akinwusi's] liability." (Agreement ¶ 3.) The "properly due and owing" language cited by Appellants refers to one of many grounds for a default of the Agreement, which triggers additional remedies like the reassignment of contracts and the ability to order contract owners to stop payment. (*See id.* ¶¶ 1, 6.) Importantly, however, Travelers did not allege default or invoke its default remedies in this litigation until it responded to Appellants' Rule 60 motion for post-judgment relief. (*See generally* Compl.; Appellants' Br. at 34 (noting that Travelers did not assert default in their motion); Travelers' Br. at 2 (noting that the default remedies "had nothing to

do with either Travelers' claims in the Complaint, or its subsequent Motion for Summary Judgment").)  The "properly due and owing" default standard thus had no bearing on the district court's entry of summary judgment.  *See Travelers I*, 2009 WL 928848, at *3–4.

Still, Appellants contend that the Agreement's use of the word "propriety" in the indemnification clause imparts a separate, affirmative obligation for Travelers to show that it paid claims that were "properly due and owing."  We reject this interpretation because it overlooks the fact that the indemnification provision unambiguously *accepts* Travelers' sworn statement of losses as "*prima facie evidence of the propriety*, amount and existence of [JOA's and Akinwusi's] liability."  (Agreement ¶ 3 (emphasis added).)

*B.  Bad Faith*

Appellants argue that Michigan law infers a duty of good faith in every contract, which a party may breach by performing in bad faith.  *See Lowe's Home Ctrs., Inc. v. LL & 127, LLC*, 147 F. App'x 516, 523–24 (6th Cir. 2005) (collecting Michigan authority recognizing an implied duty, but noting that "Michigan law does not recognize an action independent of breach of contract for a breach of the implied covenant of good faith"); *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279 (Mich. Ct. App. 2003) ("Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing.").  But, as an affirmative defense, Appellants bore the burden of pleading and substantiating the issue to place it in dispute.  *State Auto. Mut. Ins. Co. v. Reschke*, No. 2:06-cv-15410, 2008 WL 4937971, at *6 (E.D. Mich. Nov. 14, 2008) (explaining that

once a surety has satisfied the prima-facie evidence requirement by submitting a sworn, itemized statement of losses, "the burden shifts to the principal to prove the existence of a material fact for trial"); *see also Fallon Elec. Co. v. Cincinnati Ins. Co.*, 121 F.3d 125, 128–29 (3d Cir. 1997) (noting that an indemnity agreement's "prima facie evidence" clause shifted the burden onto the indemnitor to prove bad faith); *Transamerica Premier Ins. Co. v. Nelson*, 878 P.2d 314, 318 (Nev. 1994) (per curiam) (same); *Reliance Ins. Co. v. Triss Corp.*, No. 06-11548, 2008 WL 1925054, at \*5 (E.D. Mich. May 1, 2008) (treating bad faith as an affirmative defense to coverage under general liability policies); *Am. Mfrs. Mut. Ins. Co. v. Carothers Constr., Inc.*, No. 2:05-cv-00122-MCE-GGH, 2007 WL 2288318, at \*6 (E.D. Cal. Aug. 8, 2007) (placing burden on defendant to plead and prove bad faith as an affirmative defense). Notwithstanding this authority, Appellants appear to suggest that the Agreement required Travelers to make an initial good faith showing, which we understand as a variation of their "properly due and owing" argument. For the reasons explained above, we reject this interpretation as contrary to the plain language of the Agreement's indemnification clause.[1]

During oral argument, Appellants' counsel provided no explanation for the failure to plead bad faith as an affirmative defense in the answer, relying instead on Grylls's later failure to oppose Travelers' motion for summary judgment. (O.A. at 26:00–14 (recognizing that the affirmative

---

[1]To the extent that Appellants argue that Michigan's implied duty of good faith imposed a pleading requirement on Travelers, we disagree. A plaintiff need not preemptively plead and substantiate a claim of good faith before knowing whether the defendant will allege an affirmative defense of bad faith. Appellants present no authority contesting our understanding of bad faith as an affirmative defense.

defenses "should have been in the answer in the lower court," but noting that he "d[idn't] think they stated that").) Our review of Appellants' Rule 60 motion briefing further reveals that Appellants forfeited the argument that Grylls's conflict precluded them from asserting such an affirmative defense in the answer. Appellants thus forfeited their bad faith affirmative defense by failing to plead it in their answer and, as noted above, failing to raise the issue in opposition to Travelers' motion for summary judgment. *See, e.g.*, *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, 667 F.3d 669, 681 (6th Cir. 2011); *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004). Appellants attempt to overcome this hurdle by pointing to *Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968). There, the court stated that "[t]he surety had the right to settle and compromise the claims which were asserted against it but in so doing it was required to act in good faith. The uncontroverted evidence in this case demonstrated that the surety did act in good faith." *Id.* The procedural posture of that case reveals the folly of this argument. *Transamerica* reversed a district court's entry of a directed verdict at the end of a jury trial. *Id.* at 363. By addressing the issues actually disputed by the parties during the trial, *Transamerica* did not decide the indemnification agreement's minimal pleading requirements, and thus did not conclude that a surety has an affirmative obligation to substantiate its good faith in the absence of a defense of bad faith. Instead, the court explained that the indemnification agreement's prima-facie evidence clause "facilitate[s] the handling of settlements by sureties and obviate[s] unnecessary and costly litigation," and noted that "[s]ome courts have even gone so far as to uphold provisions that vouchers and other evidence of payment shall be conclusive of the propriety of payment." *Id.* (citations omitted). Thus, read in

the proper context, the cited portion of *Transamerica* does not rescue Appellants from their deficient pleadings.

Alternatively, Appellants argue that due process required Travelers to provide advance notice of the claims it would pay, pointing to Michigan case law that requires a surety to either tender a defense or prove the indemnitors' actual liability for covered claims. *See Grand Trunk Western R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 763–65 (Mich. Ct. App. 2004) (deeming the rule "well-established"); *Farmer v. Christensen*, 581 N.W.2d 807, 813 (Mich. Ct. App. 1998) (noting that "an indemnitor's due process interests would be adversely affected if it were bound by its indemnitee's unilateral acts without providing notice and an opportunity to be heard"). In other words, Appellants contend that Travelers needed to show JOA's actual liability for each of the claims it paid, unless JOA affirmatively declined Travelers' offer of defense.

We find this argument puzzling because JOA does not suggest that the Agreement obliged Travelers to tender a defense for JOA in the first place. As a Michigan appeals court recently clarified, the actual-liability burden discussed in *Grand Trunk* and *Christensen* only comes into play if the indemnification agreement contains an independent duty to tender a defense. *Ajax Paving Indus., Inc. v. Vanopdenbosch Constr. Co.*, 797 N.W.2d 704, 710 (Mich. Ct. App. 2010). *Ajax Paving* distinguished *Grand Trunk*, *Christensen*, and related cases that concerned independent duties to tender a defense, reasoning that "a person cannot oppose an allegation or claim unless he or she is aware of the same," but that "the same does not hold true for indemnification, . . . because

indemnity contemplates reimbursement for injuries/losses that have already been incurred." *Id.* We thus do not read *Grand Trunk* or *Christensen* to stand for the proposition that Michigan's guarantee of due process requires a surety to make actual-liability showings for every claim it pays before it can seek indemnification. Regardless, this variation of Appellants' bad faith argument suffers from the same defect as the others; Appellants forfeited the issue by failing raise it as an affirmative defense.

## C.  Propriety of Summary Judgment

While Appellants now dispute the propriety of the claims Travelers paid, they seemingly concede that Travelers satisfied the prima-facie evidence requirement in submitting the affidavit of a Bonds Claim Executive attesting to an itemized list of Travelers' losses and credits related to bond claims.  (*See* Appellants' Reply Br. at 13–14; R. 15, Ex. C (Scarpellino Aff.) ¶¶ 2–4 & Exs. 1–2.) The Agreement required nothing more, and thus the burden shifted to Appellants to contest Travelers' showing or to present an affirmative defense. *Reschke*, 2008 WL 4937971, at *6; *cf.* Fed. R. Civ. P. 56(c)(1) (explaining that a party asserting the existence of a genuine dispute "must support the assertion by . . . [at a minimum] showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute").  By failing to dispute Travelers' showing, Appellants failed to carry their burden, and the district court properly granted summary judgment in Travelers' favor.  *See* Fed. R. Civ. P. 56(e)(2)–(3) (authorizing district courts to consider

unopposed facts undisputed and "grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it").

## III.

We now consider the district court's denial of Appellants' post-judgment motion for *Hirsch* remand, which asserted that Grylls's conflict of interest deprived them of the ability to present meritorious defenses to Travelers' motion for summary judgment. Appellants urge de novo review rather than the abuse-of-discretion standard generally applicable to appeals of Rule 60 motions. Toward this end, they cite *United States v. Hall*, 200 F.3d 962 (6th Cir. 2000) and *Gordon v. Norman*, 788 F.2d 1194 (6th Cir. 1986), but neither case addresses the standard of review applicable to appeals of motions for post-judgment relief in civil actions. *Hall*, which involved a criminal defendant's Sixth Amendment claim for ineffective assistance of counsel, held that a defendant could raise a forfeited dual-representation claim on direct appeal as opposed to the more common habeas route. 200 F.3d at 965 (reviewing claim de novo). We thus glean no insight from *Hall* on the standard applicable in civil cases, which do not implicate the Sixth Amendment right to counsel or the direct-appeal/habeas dichotomy. *Gordon*, meanwhile, held that civil defendants did not forfeit their right to appeal the district court's denial of their attorney-conflict claim by failing to appeal the district court's denial of a Rule 60 motion, but did not address the standard of review. *See* 788 F.2d at 1196 n.2.

We find the abuse-of-discretion standard appropriate here. Appellants' *Hirsch* motion presented claims for post-judgment relief under subsections (b)(3) and (b)(6) of Federal Rule of Civil Procedure 60,[2] and this circuit routinely reviews district courts' decisions on such motions for abuse of discretion. *E.g.*, *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010); *United States v. Pauley*, 321 F.3d 578, 581 (6th Cir. 2003). Now that the district court has entered a judgment on the merits, the standard of review must reflect the "public policy favoring finality of judgments and termination of litigation." *See Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001). The fact that Defendants technically filed their conflict claim with the district court as a motion for *Hirsch* remand during the pendency of this appeal does not compel a different standard; our circuit treats the "denial of a *Hirsch* Remand [as] essentially a denial of a motion under Fed. R. Civ. P. 60(b)," and thus reviews it for abuse of discretion. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001).

Applying the abuse-of-discretion standard, this court will only reverse if the district court "'commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact.'" *Jones*, 617 F.3d at 850 (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008)).

---

[2]Appellants initially included a 60(b)(5) claim in their *Hirsch* motion, alleging offsets from the losses claimed by Travelers and requesting an evidentiary hearing. The district court denied this claim for lack of evidence, and Appellants do not appeal the denial of that claim.

A. *Rule 60(b)(3) & 60(b)(6)*

Appellants' *Hirsch* motion sought relief under Rule 60(b)(3) and (b)(6). Subsection (b)(3) permits the district court to grant relief upon a showing of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Our circuit holds that fraud under subsection (b)(3) refers to an opposing party's "knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 456 (6th Cir. 2008). "Fraud thus includes deliberate omissions when a response is required by law or when the non-moving party has volunteered information that would be misleading without the omitted material." *Id.* (internal quotation marks and citations omitted).

The "catchall provision" in subsection (b)(6), meanwhile, authorizes relief only in "exceptional or extraordinary circumstances which are not addressed" by Rule 60's other remedies. *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468 (6th Cir. 2007) (internal quotation marks and citations omitted). In addition to exceptional circumstances, "principles of equity [must] *mandate* relief" for subsection (b)(6) to apply. *Id.* Accordingly, the movant must show: (1) lack of prejudice to the non-moving party; (2) a meritorious defense; and (3) lack of culpability for the adverse judgment. *Export-Import Bank of U.S. v. Advanced Polymer Scis., Inc.*, 604 F.3d 242, 247 (6th Cir. 2010).

Because public policy favors the finality of judgments, relief under either subsection (b)(3) or (b)(6) requires clear and convincing evidence. *Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009); *Info-Hold*, 538 F.3d at 454. At this late stage of the litigation, then, mere allegations of meritorious defenses will not satisfy Appellants' burden.

*B. Appellants' Fraud & Non-Disclosure Claims Under Rule 60(b)(3)*

Although Appellants show an unusual joint representation in the Consolidated Electric proceedings, they do not present clear and convincing evidence that an *adverse party* committed fraud, misconduct, or otherwise made a material misrepresentation *in this litigation*. *See* Fed. R. Civ. P. 60(b)(3). "Rule 60(b)(3) clearly requires the moving party to show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question." *Info-Hold*, 538 F.3d at 455 (internal quotation marks and citation omitted). They have presented no evidence that Travelers knowingly misrepresented Grylls's joint representation in the Consolidated Electric proceedings or knowingly withheld such information despite a duty to disclose. And as the district court correctly noted, they present no evidence that would support the inference that Grylls acted as an adverse party or with the intent to deceive. *See Travelers II*, 2010 WL 4792182, at *5 & n.8.

We find instructive our attorney-conflict decision in *Gordon v. Norman*, 788 F.2d 1194 (6th Cir. 1986). *Gordon* arose from a driver's § 1983 claim against Tennessee police officers for excessive use of force. Following a jury verdict against the officers, the officers appealed, arguing

that their city-provided attorney "wore two hats," and that his loyalty to the city's legal interests compromised his defense of their interests. *See id.* at 1196. Specifically, the officers complained that the attorney failed to: (1) subpoena requested witnesses; (2) advise them of their potential personal liability for compensatory and punitive damages; (3) advise them of a settlement offer; (4) advise them that they could retain their own attorneys; and (5) disclose juror misconduct to the court. *Id.* at 1196–97. Noting the relative dearth of civil attorney-conflict cases, the court looked to the standard applicable in criminal cases and held that "prejudice would be presumed only if the defendant demonstrated that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected [the] lawyer's performance." *Id.* at 1198 (citing *Cuyler*, 446 U.S. at 350). The court rejected the officers' conflict claim for lack of evidence, noting that the officers had "failed to show that they were adversely affected by th[e] purported conflict or that their trial counsel failed to exercise independent judgment depriving [them] of a fair trial." *Id.* at 1198–99.

In reaching this conclusion, *Gordon* distinguished *Dunton v. County of Suffolk*, 729 F.2d 903 (2d Cir. 1984). *Dunton* involved a county attorney's joint representation of a county and one of its police officers against a § 1983 claim arising from an assault. The county attorney, in a move favorable to the county's municipal-immunity defense under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), undercut the officer's good-faith-immunity defense by characterizing the officer's actions as those of an "irate husband." *Dunton*, 729 F.2d at 907. The Second Circuit

found that this adverse action by the county attorney deprived the officer of fair representation and remanded for a new trial. *See id.* at 909–10.

The present case differs from both *Gordon* and *Dunton* in that the alleged conflict arose from a joint representation in collateral proceedings where the parties' interests align. Yet, like the police officers in *Gordon*, and unlike the officer in *Dunton*, Appellants fail to show that Grylls actively represented conflicting interests or that an actual conflict adversely affected their defense in this litigation. Appellants conceded at oral argument that they did not know whether Grylls used their confidential information against them (O.A. at 4:05–4:10), and they present no evidence that would support the inference that the joint-representation conflict precluded Grylls from opposing Travelers' summary judgment motion or otherwise caused Grylls to make a strategic decision contrary to Appellants' litigation interests. Still, Appellants contend that Travelers' payment of a portion of Grylls's legal fees compromised his representation in this case. They also dispute the parties' aligned interests in the Consolidated Electric proceedings, suggesting that Travelers wanted to lose that litigation in order to seek indemnification from them. We find no evidentiary support for this speculation.

Irrespective of the unique joint representation, Appellants fail to carry their burden of showing that an actual conflict adversely affected Grylls's representation. To the contrary, the record suggests that Travelers' payments may have enabled Grylls to *continue* his representation of Appellants. The district court's docket sheet reflects that Grylls's representation continued until at

least May 2008 (R.13 (proposed witness list)), but counsel admitted during oral argument that Appellants stopped paying Grylls's legal fees after the April 2007 cease-payment letters (O.A. at 3:30–3:45). Considering that the last of Travelers' payments occurred in December 2007 (*see* R. 24-9 at 8), one would expect that an actual conflict would have manifested well before the summary judgment briefing in July 2008. As for the Consolidated Electric proceedings, Appellants present no evidence for their claim that Travelers wanted Grylls to lose that litigation so that Travelers could seek indemnification from Appellants.

Unable to show that Travelers or Grylls engaged in fraud, Appellants contend that Travelers had a duty to disclose Grylls's conflict to the district court before the entry of judgment. As before, Appellants invoke the conflict standards applicable to criminal cases, arguing that this court should automatically reverse because Travelers did not disclose the conflict and the district court did not rule on the conflict prior to the judgment. (*See* Appellants' Br. at 36–37, 41–43 (citing *Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980).) Yet those cases, which involve a criminal defendant's Sixth Amendment right to effective assistance of counsel, do not speak to a civil litigant's duty to disclose the conflict of an adversary's attorney. As noted above, *Gordon* held that, for purposes of attorney conflicts in civil cases, "prejudice would be presumed only if the defendant demonstrated that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected [the] lawyer's performance." 788 F.2d at 1198.

Appellants emphasize that *Gordon*'s conflict analysis closed with the admonition "that the judge and the parties have joint responsibility to guard interests that are actually threatened" by an attorney conflict. *Gordon*, 788 F.2d at 1199. We do not read that language to have created a specific duty of disclosure for Travelers in this case. First, *Gordon* addressed a specific type of attorney conflict not present in this case: that of a municipal attorney simultaneously defending the adverse interests of the municipality and its employees in § 1983 lawsuits. *Gordon*, 788 F.2d at 1199 (noting "the great potential for conflict in this field"). Second, Appellants present no evidence that Travelers knowingly misrepresented or withheld information regarding Grylls's joint representation. At the onset of the joint representation in the Consolidated Electric proceedings, Grylls notified Travelers that *JOA* selected him to represent Travelers. (R. 31, Ex. 1, Ex. A.) Then, after Travelers filed suit against JOA and Akinwusi in this litigation, Grylls sent a conflict letter to all parties requesting their consent to the joint representation in the Consolidated Electric proceedings. (R. 24-8.) By that time, Grylls already represented Travelers in that litigation for more than six months. Although Akinwusi never signed and returned the conflict letter to Grylls, neither he nor the JOA representative present at the Consolidated Electric arbitration hearing objected to Grylls's continued representation of Travelers. (*See* R. 26, Ex. L (Frank aff.) ¶ 3.)

When asked about these details during oral argument, Appellants' counsel admitted to a lack of evidence disputing the claim in Grylls's January 2007 letter that JOA selected Grylls to represent Travelers. (*See* O.A. at 27:45–28:10.) Under the circumstances, Travelers had no reason to think that Appellants did not know of the joint representation in the Consolidated Electric proceedings.

And considering the aligned interests in the Consolidated Electric proceedings, Travelers had no reason to suspect that Grylls would represent interests adverse to Appellants in either the Consolidated Electric proceedings or this litigation.

In the absence of clear and convincing evidence that Travelers knowingly committed fraud or violated a duty of disclosure, the district court did not abuse its discretion by denying relief under Rule 60(b)(3).

## C. *Appellants' Gross Negligence Claim Under Rule 60(b)(6)*

Similarly, the district court did not abuse its discretion in concluding that Appellants failed to show the extraordinary circumstances and equitable considerations necessary for Rule 60(b)(6) relief. In civil cases, the law generally holds clients responsible for the actions and omissions of their chosen attorneys, even if inexcusably negligent. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396–97 (1993); *Allen v. Murph*, 194 F.3d 722, 723 (6th Cir. 1999); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 n.10 (1962) (suggesting that the proper remedy for a neglected client "is against the attorney in a suit for malpractice"). Appellants correctly note that courts occasionally deem attorneys' misconduct sufficiently egregious to warrant post-judgment relief for their abused clients. *E.g.*, *Fuller v. Quire*, 916 F.2d 358, 361 (6th Cir. 1990) (affirming district court's grant of 60(b)(6) relief where attorney's failure to attend a docket call led to dismissal of the case for lack of prosecution, and the negligent attorney failed to inform the client of the dismissal for more than a year despite the client's frequent inquiries); *Valvoline Instant Oil Change*

*Franchising, Inc. v. Autocare Assocs., Inc.*, No. 98-5041, 1999 WL 98590, at \*4–6 (6th Cir. Jan. 26, 1999) (reversing district court and granting 60(b)(6) relief from a default judgment where attorney: stole money from his clients; lied to his clients about the case status; failed to file a Rule 26 report and timely opposition to the adversary's summary judgment motion; and failed to appear at numerous noticed depositions); *Patterson v. Twp. of Grand Blanc*, 760 F.2d 686, 687–88 (6th Cir.1985) (reversing district court's Rule 41(b) dismissal for failure to prosecute because plaintiff was not culpable in attorney's failure to conduct discovery, timely file discovery responses, or obey multiple court orders); *see also Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3rd Cir.1978) (vacating judgment where attorney actively campaigning for a common pleas judgeship failed to file a responsive pleading in more than 50 cases, effectively "leaving his clients unrepresented"); *but see Soto v. Mineta*, No. 01-71244, 2008 WL 4428010, at \*14–18 (E.D. Mich. Sept. 30, 2008) (denying post-judgment relief, despite attorney's failure to oppose summary judgment motion, where attorney's performance involved "no subordination of her client's interests," or "intentional abandonment or sabotage of [the client's] case").

The district court examined *Boughner* and similar cases, but found that Grylls's non-disclosure and failure to oppose Travelers' summary judgment motion did not rise to the level of misconduct recognized in those cases. *Travelers II*, 2010 WL 4792182, at \*6. Presented with Appellants' paltry conflict showing, we find no abuse of discretion. Importantly, Appellants present no evidence regarding *why* Grylls ceased representation, *how* they attempted to monitor the case progress, or *when* they learned that Grylls withdrew. Moreover, they do not suggest that Grylls

actively misled them about his representation in either the Consolidated Electric proceedings or this litigation.

Appellants stress that Akinwusi suffered a stroke in April 2007 that required a month-long hospital stay and subsequent rehabilitation (Akinwusi aff. ¶¶ 16–20), but they do not explain how his incapacity in the spring and summer of 2007 prevented JOA from checking the case status after Travelers moved for summary judgment in July 2008 (a year later) or prior to the district court's entry of summary judgment in March 2009 (almost two years later). They concede, however, that JOA stopped paying Grylls's legal fees after Travelers issued the cease-payment letters in April 2007. Consequently, Appellants have not shown themselves blameless in monitoring their defense. *See Soto*, 2008 WL 4428010, at *17 (noting that the client will be deemed complicit in the attorney's failure to prosecute claims if the client acquiesces to communication droughts).

Granted, Grylls should have obtained Appellants' express consent before continuing the joint representation in the Consolidated Electric proceedings, and he should have asked the district court for permission to withdraw at some point prior to the district court's entry of judgment. But these omissions, without more, do not constitute extraordinary circumstances compelling post-judgment relief.

We further agree with the district court that Appellants' defenses lack merit. Akinwusi generally denies that any claims were "properly due and owing" prior to Travelers cease-payment letters of April 12, 2007, and further alleges that Travelers seeks unspecified improper losses, such

as work beyond JOA's contract and double-payment. (Akinwusi aff. ¶¶ 1–6, 23–24.) As noted above, Travelers did not seek indemnification under the Agreement's "properly due and owing" default standard, and Appellants did not plead an affirmative defense of bad faith. Even accepting Appellants' allegations, it remains unclear which losses Appellants dispute and why, because Appellants do not match their defenses to the itemized losses set forth in Travelers' sworn statement of losses. And the mere fact that JOA's contracts with subcontractors conditioned payments on its receipt of payment does not demonstrate that JOA owed nothing to subcontractors or that Travelers paid claims in bad faith.

Instead, it appears that Appellants now seek to escape liability on the basis of Travelers' reassignment of the TASS project, a subject not addressed in either party's original pleadings before the district court. Despite the Agreement's requirement that modifications be made in writing (Agreement ¶ 16), and the Army's unequivocal termination letter detailing nearly two years' worth of complaints (Army termination letter ¶ 3), Appellants argue that Travelers and the Army orally agreed to allow JOA to finish the TASS project, effectively nullifying the Army's written termination and waiving Travelers' reassignment and indemnification rights. Appellants' affidavits provide minimal information regarding this purported oral agreement, but neither Akinwusi nor JOA's general manager claim that Travelers relinquished its reassignment rights under the Agreement. (*See* Akinwusi aff. ¶¶ 7–10; Allen aff. ¶ 3.)

The district court correctly noted that Michigan law requires clear and convincing evidence of a modification in order to overcome a contract's written modifications requirement. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003). "In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the particular original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses." *Id.* Appellants did not present clear and convincing evidence that Travelers waived the Agreement's written-modification requirement or that the Army revoked its termination of the TASS contract. The district court thus did not abuse its discretion in finding that Akinwusi's and Allen's vague account of an oral agreement "d[id] not overcome (1) written evidence that the Army had declared a default, (2) the provisions of the Indemnity Agreement making such a declaration a basis for triggering Travelers' remedies under the Agreement, or (3) the provisions of the Indemnity Agreement requiring any modifications to the Agreement to occur in writing." *Travelers II*, 2010 WL 4792182, at *8. Nor did it abuse its discretion in concluding that the Army's unequivocal termination letter authorized Travelers to issue the April 12, 2007 cease-payment letters, such that the letters alone did not evince bad faith. *See id.* at *8 (citing the complaints listed in the termination letter).

Finally, Appellants contend that "Travelers had specifically indicated that JOA could negotiate, attempt to resolve and litigate" certain bond claims identified in Travelers' sur-reply to the Rule 60 motion, generally citing the affidavits of Akinwusi and Allen and a pair of letters JOA sent to suppliers. (Appellants' Br. at 55 (citing R. 33, Exs. 3–6).) They do not explain how this

argument constitutes a defense to losses claimed in Travelers' motion for summary judgment, nor do the cited exhibits.

## IV.

For these reasons, we AFFIRM the district court's judgments.